## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **GABRIEL CORTES VILLANUEVA**<br><br>**Plaintiff**<br><br>v.<br><br>**PUERTA DE TIERRA, LLC; MCCORMACK BARON MANAGEMENT PUERTO RICO LLC**<br><br>**Defendant** | **CIVIL No.** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** Plaintiff Gabriel Cortes Villanueva, through counsel, and hereby complaints as follows:

### NATURE OF ACTION

1. This is a civil rights action filed by the plaintiff Gabriel Cortes Villanueva (hereinafter "Plaintiff", "Mr. Gabriel Cortes" or "Mr. Gabriel") against McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC (Also collectively as "Defendants") for the violation of provisions of the federal law known as the Fair Housing Act, as amended in 1988, 42 U.S.C. §§3601 et seq. (hereinafter referred to as the "Fair Housing Act" or

- 1 -

FHA for short)[1] and also damages are being sought under Article 1536 of the Puerto Rico Civil Code.

## JURISDICTION

2.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367. Remedies are also sought pursuant to 28 U.S.C. §§ 2201 and 2202.

3.    The Plaintiff seeks redress for actual and ongoing damages suffered as a result of the illegal housing discrimination carried out by the Defendants due to the Plaintiff's disability, under the Fair Housing Act and related state legislation.

## PARTIES

4.    The plaintiff Gabriel Cortes Villanueva is a natural person, a citizen of the United States of America, and a resident of Puerto Rico, whose mailing and residential address is: 195 Ave Fernandez Juncos Apt 412 San Juan PR 00901.

5.    At all relevant times in this matter, the plaintiff was a "qualified individual with a disability" as defined by the ADA (Americans with Disabilities Act) and state legislation. Mr. Gabriel suffers from various

---

[1] The Fair Housing Act, also known as the Fair Housing Act (FHA), as amended in 1988 by the Fair Housing Amendments Act (FHAA), prohibits discrimination based on disability within the context of housing. This law requires all types of housing, both public and private, to make reasonable accommodations and modifications to allow individuals with disabilities to enjoy their housing on an equal basis and to use it safely.

health conditions that result in physical disability. These conditions are as follows: (1) chronic fibromyalgia, (2) herniated disc in the neck, (3) osteoarthritis in different parts of the body, (4) a knee replacement in the left leg, (5) stenosis in the lower back, (6) lumbar problems, (7) lumbar osteoarthritis, (8) degeneration of the lower back spine, (9) osteophyte in the lower back.

**6.** All the aforementioned conditions together limit the mobility of Mr. Gabriel Cortes, making it difficult for him to perform daily activities such as walking, running, climbing or descending stairs, bending, and other everyday tasks that he is unable to do. He requires assistance from others and relies on using a cane. However, he often experiences significant pain when engaging in physical activities such as walking or any other physical exertion.

**7.** McCormack Baron Management Puerto Rico LLC; is a legal entity engaged in for-profit business in Puerto Rico, which owns, operates, manages, or leases the property known as "Bayshore Villas Apartments", located at #195 Ave. Fernández Juncos, San Juan PR 00901.

**8.** Puerta de Tierra, LLC; is a legal entity engaged in for-profit business in Puerto Rico, which owns, operates, manages, or leases the property known as "Bayshore Villas Apartments", located at #195 Ave. Fernández Juncos, San Juan PR 00901.

## FACTS

9.   Mr. Gabriel Cortes is a beneficiary of the "Public Housing Program" of the Puerto Rico Public Housing Administration. As such, he applied for the housing complex known as "Bayshore Villas Community in Puerta de Tierra, San Juan", located at 195 Fernández Juncos Avenue, San Juan, P.R. 00901.

10.   After his pre-application, on March 25, 2019, Mr. Gabriel Cortes received a letter via email requesting his presence on April 2, 2019, at 12:00 p.m. at one of their offices located at Renaissance Square, 65 Quisqueya Avenue, San Juan, Puerto Rico 00917. During this appointment, Mr. Gabriel was required to submit a series of documents based on his family composition, as applicable.

11.   On April 2, 2019, Mr. Gabriel Cortes attended the previously scheduled appointment where he was assisted by Ms. Liliam Pujals, who is currently the general manager of the projects but at that time was the administrator of Bayshore Villas complex (Property Manager). During the meeting, Mr. Gabriel informed Ms. Liliam Pujals that he had a disability and required a first-floor apartment. Among the documents Mr. Gabriel handed to Ms. Liliam Pujals was his ID, identifying him as a person with disabilities from the Department of Health of Puerto Rico. He reiterated his need for a first-floor apartment. However, Ms. Pujals informed him that she didn't require that document and disregarded Mr. Gabriel's ID.

12.  Considering what happened, Mr. Gabriel reiterated to Mrs. Pujals his request for a ground-floor apartment and asked her if she needed him to provide medical certifications to prove his physical disability, which consequently hindered him from climbing stairs. Mrs. Pujals once again told him that it was not necessary and only handed him a form to be filled out by his doctor. During that meeting, Mr. Gabriel was assured that he would indeed obtain a first-floor apartment.

13.  Later, they contacted Mr. Gabriel again to inform him that he should come to the Renaissance Square offices on Saturday, May 11, 2019, this time to sign the lease agreement as his application had been approved. On that day, he was once again received by Mrs. Lilliam Pujals. Just as Mr. Gabriel was about to start completing the contract documents, Mrs. Lilliam Pujals informed him that it would not be possible for him to be given a first-floor apartment. She explained that those apartments had been assigned to elderly individuals with specific needs, and only after accommodating those individuals would they notify him if it would be possible to place him in a first-floor apartment. As a result, Mr. Gabriel was assigned a fourth-floor apartment and was assured not to worry because the housing complex module where his apartment was located had an elevator. On that day, he was only given the parking beeper and a copy of the contract. The keys to the apartment were not handed over to him.

14.  Due to the residential complex being built at that time (2019), Mr. Gabriel

Cortés visited Bayshore Villas Apartments to check on the progress of the project. During one of these visits, Mr. Gabriel had the opportunity to enter the housing complex and met the engineer in charge of the construction. The engineer showed Mr. Gabriel Cortes that there were apartments for people with disabilities in one of the modules of the complex, and mentioned that it was vacant and available. At that moment, Mr. Gabriel felt confused because he had been given a fourth-floor apartment despite stating his need for a first-floor one, with the excuse that there were no more available.

15.  Then, on Monday, May 13, 2019, Mrs. Erica Castro, the administrative assistant of the complex, contacted Mr. Gabriel to inform him that he should come to pick up the key to his apartment at Bayshore Villas Apartments the following day, Tuesday, May 14, 2019. When Mr. Gabriel arrived at the housing complex, he noticed that he was being taken to the elevator. He went up and was given an apartment designed for blind or visually impaired individuals, which did not meet his needs as a person with physical disabilities. This apartment was not adapted at all for a person with physical disabilities. It lacked grab bars, an accessible toilet, a seat in the bathtub, and a shower handle. At that moment, Mr. Gabriel expressed his dissatisfaction with the apartment. However, he felt that there was little else he could do, as he believed it was "better to have something than nothing", and he had already been informed that there were no available first-floor apartments.

16.  When Mr. Gabriel Cortés was already living in Bayshore Villas
Apartments, the elevator in his unit would often malfunction or be out of
service, forcing him to use the stairs. This caused him a great deal of
difficulty and pain due to his physical limitations. As the days went by,
Mr. Gabriel noticed that using the bathroom was causing him discomfort.
The bathtub was not designed for his needs, the toilet lacked grab bars
and an accessible seat, and the shower did not have grab bars or a seat for
disabled individuals. The room itself did not have railings. Additionally,
Mr. Gabriel began to realize that his apartment was located too far from
the parking area where his vehicle was, causing him to experience pain
and excessive fatigue from walking that long distance between his
apartment and the parking area. Regarding these issues, Mr. Gabriel
made several requests at the office, but they only listened to him, wrote it
down on paper, and informed him that they would submit the requests.
However, in the end, none of the requested accommodations were installed
for Mr. Gabriel.

17.  Mr. Gabriel was one of the first people to move into Bayshore Villas
Apartments, and during the initial weeks, he noticed that the first-floor
apartments had not even been occupied and were available. He couldn't
understand why he hadn't been given one of those apartments, especially
one designed for a person with physical disabilities like himself.

18.  During the first few years of living in the complex, Mr. Gabriel faced
several difficulties as the elevator would frequently break down. In order

to reach his apartment, there was no alternative but to climb the stairs, which was extremely challenging and painful given Mr. Gabriel's condition. He also discovered that the designated trash room (located near Mr. Gabriel's apartment, right next to the elevator) was locked. The room has never been open, which forces Mr. Gabriel and all the residents to walk a considerable distance from their apartments to the garbage area located in the parking lot.

19. Parking is another issue as Mr. Gabriel has to walk a considerably long distance from the parking area (both for disabled and regular parking) to the entrance of the complex. Many times, when there are available parking spaces outside the complex, Mr. Gabriel chooses to park there as it is closer to the entrance and the elevator but It's worth noting that this area is rarely available for parking, as it is often occupied by other vehicles, which forces Mr. Gabriel to park within the complex and walk that long distance to reach his apartment. There was also another situation where the hallway directly in front of Mr. Gabriel's apartment and the elevator would flood when it rained because it lacked proper drainage. The water would enter Mr. Gabriel's apartment, reaching the kitchen area. The residents would have to sweep and remove the water to prevent any accidents for Mr. Gabriel due to the water in front of his apartment. The residents took it upon themselves to place towels at Mr. Gabriel's door to prevent water from entering his apartment. Additionally, two of his neighbors installed a rod under his door in an attempt to

prevent further water from entering the apartment.

20. Mr. Gabriel went to the office to file a complaint about what was happening, but they only took note of it on paper and never provided him with a copy of a formal complaint or anything of the sort. Another situation occurred when the tenants in the apartment directly below Mr. Gabriel's apartment (Apt. 312) would turn on their air conditioning unit, causing moisture to seep through the ceiling and onto the floor of Mr. Gabriel's apartment (Apt. 412). This resulted in the floor becoming wet and slippery. Mr. Gabriel made several complaints through the residents' portal and even personally visited the office on September 23, 2020, at 1:00 p.m., to report the issue to Mrs. Erica Castro. However, no action was taken. The response Mr. Gabriel received was that they had spoken to the tenants to lower the air conditioning because, according to them, it was part of the building's poor construction. During these incidents, Mr. Gabriel also requested the installation of a grab bar in the room, but it was never installed.

21. Mr. Gabriel had to sleep in the living room for approximately three months. It was a very challenging time for him, as the immense heat and his existing conditions made it extremely difficult. He had to resort to sleeping in the living room because he was afraid of slipping and falling, which could result in a serious injury given his condition. One day, he did

slip and injured his toenail.[2]

22. The situation with the elevator in the housing complex where Mr. Gabriel's apartment is located is a matter of great concern to him. Mrs. Pujals had told him, "Don't worry, there's an elevator". However, the maintenance of the elevator has been poor, as on several occasions Mr. Gabriel has faced the ordeal and nightmare of it being out of order, leaving him with no choice but to climb up or down the stairs. It is important to note that Mr. Gabriel lives on the fourth floor, and for him, it is nearly impossible to climb those stairs due to the pain in his body preventing him from doing so.

23. When Mr. Gabriel returns from running errands, medical appointments, or grocery shopping, it becomes more difficult. He always carries a cart where he puts his belongings, purchases, etc. This is because Mr. Gabriel uses a cane, and his back condition prevents him from lifting or carrying heavy objects. On some occasions, his neighbors have helped him, or his caregiver has had to support him to go up or down. Furthermore, despite Mr. Gabriel stating from the very beginning that he needed a ground-floor apartment, he also mentioned that he had the assistance of a caregiver. However, in none of the contracts from 2019 to 2022 was Mr. Gabriel informed that his caregiver needed to complete any documents to be

---

[2] Mr. Gabriel has photos and videos of the wet floor and the injury he sustained to his toenail. However, he does not have evidence of the complaints he made because the defendant closed the residents' portal of Bayshore Villas Apartments, where all the registered complaints made by Mr. Gabriel were stored.

authorized as his living aid. This requirement was only introduced in the latest contract, the one currently in effect for 2023. In his third reasonable accommodation request, Mr. Gabriel also requested a two-bedroom apartment as his caregiver sleeps on an inflatable mattress in the living room. This is because he doesn't have an additional room where she can stay and assist him.

24.     Since day one, Mr. Gabriel has been requesting a change of apartment both verbally and in writing. In total, Mr. Gabriel has made three reasonable accommodation requests. For the first two requests, Ms. Erica Castro refused to provide him with a copy, stating that she filled out the forms and that it was not her fault if the management sent them for approval or not. The management of Bayshore Villas Apartments did nothing in response to these two requests, and when Mr. Gabriel followed up, they claimed to have no record of them, implying that they had been lost or disregarded. It is worth noting that these requests were always accompanied by medical letters from Mr. Gabriel' doctors.

25.     The third time Mr. Gabriel submitted one of these requests was on May 5, 2022. A few days prior, he was contacted by Ms. Erica Castro, who informed him that they had identified a unit that would soon be available. She even provided him with the unit number and asked him to come down and complete the accommodation request again, as it seemed the previous ones had never been submitted. Assisted by Ms. Castro, Mr. Gabriel filled out    the    accommodation    request    form    again,    providing    detailed

information as instructed. According to Ms. Castro, he needed to specify that he required a two-bedroom unit due to his caregiver. She also mentioned that the request for a unit on the first floor had already been made, but he should add the requirement for a two-bedroom unit for his caregiver. Mr. Gabriel complied with these instructions.

26.   After having completed this request, several employees of the complex confirmed to Mr. Gabriel that they had indeed sent someone to clean an apartment, and they understood that it would be the apartment they were going to assign to him. Mr. Gabriel was very excited because, after several years of living in the complex and requesting this accommodation, it seemed that they were finally going to grant it to him. Approximately a month passed, and on June 2, 2022, Mr. Gabriel called the management office of Bayshore Villas Complex and found out that the administrative assistant no longer worked there. Mr. Gabriel stated that he was calling to follow up on his reasonable accommodation request, but the office staff was unaware of what Mr. Gabriel was referring to. In response, Mr. Gabriel requested to speak with the complex administrator and Mrs. Jemika López, the new administrator of the housing complex, takes Mr. Gabriel' call and informs him that she is unaware of what Mr. Gabriel is talking about. She states that she has no knowledge of any reasonable accommodation request, or anything related to it. She claims to have no understanding of his concerns and abruptly ends the call.

27.   Several days later, Mr. Gabriel receives a call from Mrs. Jemika López,

who informs him that they had apparently been searching in the offices and had found his reasonable accommodation request in a drawer. She acknowledges that it had been submitted and assures him that they are awaiting a response.

28. On June 22, 2022, Mr. Gabriel is summoned to a meeting with the administrator, Mrs. Jemika López, at 3:00 p.m. through a letter. According to the letter, the meeting is scheduled to discuss important matters. This time, Mr. Gabriel attends the appointment accompanied by his caregiver to serve as a witness, as he has lost trust in the people working in the administration. On that day, Mr. Gabriel submits another reasonable accommodation request. He personally retrieved the request from the Public Housing offices, and it is accompanied by a letter from his doctor, Dr. Verónica Vélez. In the request, Mr. Gabriel states that he has disabilities and is incapacitated by social security. He mentions having undergone two leg surgeries, including knee replacement, and experiencing mobility issues that require him to use a cane and leg braces. He also indicates severe fibromyalgia and upcoming back surgery. Mr. Gabriel explains that he currently resides in a one-bedroom apartment on the fourth floor and, due to his health conditions and mobility problems, requires the assistance of a caregiver for his daily living activities.

29. In that reasonable accommodation request, Mr. Gabriel also mentioned that the elevator is occasionally out of order, and he is unable to climb the stairs. As a result, when he attempts to climb the four floors, his pains

worsen due to his health conditions, and he is forced to spend days in bed, being assisted by his caregiver. The reasonable accommodation request also included letters from various doctors, including Dr. Verónica Vélez, who signed a medical certification of impairment on June 14, 2022, stating that Mr. Gabriel requires a reasonable accommodation for a first-floor apartment with 2 bedrooms.

30.   During the meeting, to which Mr. Gabriel was summoned and accompanied by his caregiver as a witness, he was informed by Ms. Jemika López, the new complex administrator, that his reasonable accommodation request (the one he submitted on May 5th) had been approved. As they were reading the terms to Mr. Gabriel, he realized that the unit they were offering him was on the second floor. Mr. Gabriel informed Ms. López that he cannot climb stairs, and she responded by saying that he should have been more specific when completing the request. Mr. Gabriel pointed out that his doctors clearly specified his needs in the letters accompanying the reasonable accommodation request. At that moment, Ms. Jemika López was unaware of the letters that were submitted with the request. Mr. Gabriel informed her that all his accommodation requests were accompanied by multiple medical letters. Ms. López stated that they had no other requests and that they only found the one in a discarded drawer, with nothing else. They informed him that his documents had been misplaced and that they had no record of what he was saying. Mr. Gabriel showed copies of the medical letters and

demonstrated that they had been received by office employees and signed by them. As soon as Ms. Jemika saw the documents, she asked Mr. Gabriel to give them to her so she could make copies and place them in his file, but Mr. Gabriel refused, stating that those documents should be in their possession as they contain private and confidential information about him. Ms. Jemika stated that they would need to resubmit the request and wait for approval again, this time specifying all the accommodations Mr. Gabriel needed.

31. Due to the offer of a second-floor apartment, Mr. Gabriel expressed his knowledge of first-floor apartments available for people with disabilities in other sections, but he was told that as a beneficiary of the "Public Housing Program", he did not qualify for another section and would not be transferred to those apartments. The administrator of Bayshore Villas Apartments informed Mr. Gabriel that they would provide an apartment as long as it falls under the same programs he benefits from, and even if there were available units that were not part of the "Public Housing Program", they could not provide the reasonable accommodation.

32. During that meeting, Mr. Gabriel also expressed his dissatisfaction as he had been requesting the installation of an accessible toilet and grab bars in the bathroom for a while, and he was still waiting. Quickly, Ms. Jemika López completed the requests for those items on behalf of Mr. Gabriel, and the next day, on Thursday, June 23rd, an accessible toilet extension and a wall-mounted grab bar were installed for Mr. Gabriel (after 3 years of

requesting and waiting for assistance).

33. After learning that his reasonable accommodation requests, medical documents, and other important papers had been misplaced, and realizing that only his latest reasonable accommodation request had been submitted, Mr. Gabriel decided to visit the Office of the Ombudsman for Persons with Disabilities located at the Roberto Sánchez Vilella Government Center (Minilla) on Avenida de Diego, Santurce, P.R., to report what was happening to him. However, he was informed that they couldn't take any action and advised him to seek assistance from the Department of Housing and Urban Development (HUD). They provided him with a document containing the contact information for HUD. Concerned about this distressing situation, on July 18, 2022, Mr. Gabriel decided to file a complaint with HUD to assert his rights and seek help regarding the discrimination he was experiencing in his housing. He also chose to hire the services of a lawyer to draft a letter and inform McCormack Baron Management Puerto Rico LLC and the management of Bayshore Villas Apartments about the discrimination they were subjecting him to.

34. On July 29, 2022, Mr. Gabriel contacted the office of Bayshore Villas as he had received several missed calls, and they instructed him to come down to receive the document approving the requested reasonable accommodation. Present that day were Ms. Jemika López, Ms. Lilliam Pujal, Mr. Gabriel, and his caregiver, Ms. Aileen López. Mr. Gabriel

receives the document but informs them that he needs to read it carefully and analyze it before signing, so he takes it with him. Upon reading the document, Mr. Gabriel notices that the specified date on the document is May 5, 2022, even though he had been requesting this accommodation since 2019. He refuses to sign the document because it falsely states that he only made a request for accommodation on May 5, 2022, which is not true.

35. Following the filing of the complaint, a meeting was held with the administration of Bayshore Villas Apartments. On Wednesday, August 10, 2022, Mr. Gabriel was again summoned to a meeting at 2:30 P.M. In the letter, the administration informed Mr. Gabriel that the meeting was to follow up on his request for reasonable accommodation and that it would be led by Ms. Lilliam Pujals. Present at the meeting were Ms. Jemika López, Ms. Lilliam Pujals, Ms. Ilia Rivera, Mr. Gabriel, and his caregiver, Ms. Aileen López. During this meeting, after receiving the letter from the legal representation hired by Mr. Gabriel for the administrative process and being informed of the complaint filed with HUD, they apologized to Mr. Gabriel. They informed Mr. Gabriel that on July 27, 2022, his request for reasonable accommodation had been approved. However, they stated that there were no available units within the Bayshore Villas community that met his needs or the approved reasonable accommodation.

36. However, despite his reasonable accommodation being approved, they

informed him that they had been in contact with the Public Housing Administration and stated that the latter had sent them Mr. Gabriel' Pre-Application for their program and a list of available properties. Essentially, the administration of Bayshore Villas Apartments told Mr. Gabriel that his reasonable accommodation had been approved, but he would have to go somewhere else in order to be given a first-floor apartment with two bedrooms. Mr. Gabriel felt like he was being pushed out of his home and that they didn't want to guarantee him a place at Bayshore Villas Apartments. They also informed him that he was first on the waiting list, but it is unclear since when he has been first on the list because there have been available housing units on the first floor since 2019, and he was never relocated or provided with the requested accommodations.

37. The next day, on Thursday, August 11, 2022, Mr. Gabriel contacted Ms. Jemika López and requested a true and accurate copy of his file with all his documents. Ms. Jemika informed Mr. Gabriel that she was currently in an audit but would make the copies and send them to him as soon as she was available. Later that day, around 6:20 p.m., Ms. Jemika López and Ms. Lilliam Pujals went to Mr. Gabriel's apartment to personally deliver a copy of the requested file. When Mr. Gabriel checked the documents, he noticed that the file was incomplete. It did not contain all the medical letters that were requested and submitted by him at the office, nor did it have the forms for the reasonable accommodations he had been

requesting since 2019, or any documents related to the complaints filed by Mr. Gabriel since 2019.

38. The proceedings with HUD continued, and Mr. Gabriel had legal representation different from the undersigned. Before HUD, attempts were made to reach a conciliation agreement because the administration of Bayshore Villas Apartments indicated that they had discovered that someone was living in a first-floor apartment who did not qualify to live there. Therefore, it was possible to transfer Mr. Gabriel Cortes to that first-floor unit with two bedrooms. However, months passed, and Mr. Gabriel had no news regarding the conciliation agreement or the process with HUD.

39. During this period of time, Mr. Gabriel Cortes received constant inappropriate letters from the administration, namely from Mrs. Lilliam Pujals and Mrs. Jemika López, summoning him to meetings to discuss matters supposedly related to his accommodation request. He requested that they communicate with his legal representation at HUD. Mrs. Lilliam Pujals scheduled meetings with him and pressured him to choose a different apartment than the one indicated in the proposed settlement agreement, all behind the back of the administrative process with HUD and his legal representation.

40. In the last meeting he was summoned to by Mrs. Lilliam Pujals on Tuesday, May 16, 2023, she expressed her frustration to Mr. Gabriel, indicating that if he didn't accept the apartment she wanted to show him,

he would lose everything and be left with nothing. She also claimed that they had done nothing wrong, just took longer to provide him with the accommodation. Furthermore, she mentioned that the person currently living in the offered unit would not move out, and he would lose everything if he didn't accept it. Mr. Gabriel simply informed her that he was unaware of what she was telling him because a conciliation process was underway, and his representatives, including his lawyer and HUD, had not notified him of any of the information she was providing. He made it clear that anything she wanted to communicate should be directed to his lawyer or through HUD, and that everything should be in writing, not through the informal manner in which she was conducting herself. In response, Mrs. Pujals, expressing her annoyance, simply said, "That's up to you" and asked Mr. Gabriel to leave.

41.  Upon encountering this situation, Mr. Gabriel became extremely nervous and distressed as he couldn't understand what was happening. He immediately contacted his legal representative at the time, his lawyer, and informed her of what had just occurred with Mrs. Lilliam Pujals. However, the lawyer was unaware of the information being shared by her client, Mr. Gabriel. She indicated that she had no knowledge of any developments regarding the housing unit mentioned in the conciliation agreement.

42.  The apartment that had been included in the settlement agreement was suitable for Mr. Gabriel, but the administration of Bayshore Villas

Apartments continued to communicate with him in an unethical and irregular manner. They offered him a housing unit located far from the parking area, where there was also a foul odor due to garbage in the vicinity. Furthermore, these apartments they offered were already occupied by residents who were currently residing there, as stated by the administration themselves. In other words, the administration of Bayshore Villas Apartments wanted to provide a completely different reasonable accommodation than what was agreed upon in the HUD conciliation draft. Ultimately, they were seeking what was most convenient for them rather than considering Mr. Gabriel's needs.

43. After this situation, Mr. Gabriel is informed that there was indeed an issue with the apartment they were offering him in the conciliation agreement, and they would not be able to fulfill what was already written in the draft agreement that Mr. Gabriel was willing to sign. Mr. Gabriel once again feels deceived by the administration of Bayshore Villas, as they never notified him that the agreement with that apartment could not be fulfilled, and they have taken a considerable amount of time to close this conciliation agreement without just cause. Mr. Gabriel still wonders daily: Why did it take them so long to move him to the agreed-upon apartment? Why is he still on the fourth floor? Why didn't they move him immediately?.

44. When McCormack Baron Management Puerto Rico LLC learns that Mr. Gabriel no longer wishes to proceed with the conciliation agreement

because he was deceived and they wanted to give him a completely different apartment that did not meet his needs, they try to contact him to inform him that, in the end, despite previously stating that the offered apartment would not be possible, they could suddenly provide it. However, Mr. Gabriel no longer had trust in them or their word.

45.    In addition to the aforementioned, Mr. Gabriel has faced multiple acts of discrimination over the years. Despite informing that he had disabilities, he was assigned an apartment that was not suitable or in line with his needs. As a result, he had to submit several requests to the administration of Bayshore Villas Apartments for the installation of grab bars and other accessories in his bathroom to make it accessible for him. Unfortunately, Mr. Gabriel does not have access to these requests as he submitted them through a resident portal of Bayshore Villas Apartments that is currently unavailable. So, the apartment he was given, in addition to being on the fourth floor, was also not accessible for him, which is in complete contradiction with the Fair Housing Act Design Manual.

46.    Due to all the events described above, Mr. Gabriel has experienced significant mental distress. The constant discrimination, broken promises, and lack of consideration for his needs have taken a toll on his emotional well-being. The prolonged delays, miscommunications, and unfulfilled accommodations have caused him immense frustration, anxiety, and feelings of helplessness. The repeated instances of being misled and treated unfairly by Bayshore Villas Apartments have created

a constant state of mental anguish for Mr. Gabriel, impacting his overall quality of life and exacerbating his existing challenges.

47. Due to all the events described above, Mr. Gabriel has not only experienced mental distress but has also endured physical pain and discomfort. The assignment of an apartment on the fourth floor, without accessible elevators or suitable accommodations, has forced him to navigate multiple flights of stairs daily. This lack of accessibility poses a significant challenge for Mr. Gabriel, considering his physical limitations. The constant strain of climbing the stairs has resulted in increased physical pain, muscle fatigue, and a heightened risk of injury. The combination of mental anguish and physical strain has taken a significant toll on Mr. Gabriel's overall well-being, further exacerbating his difficulties and hindering his ability to enjoy a peaceful and comfortable living environment.

## FIRST CAUSE OF ACTION

48. The above allegations are incorporated by reference.

49. Individuals with disabilities have the right to accessible housing, which is adapted for individuals with disabilities. This is mandated by the Fair Housing Act, as amended in 1988, 42 U.S.C. §§3601 et seq.

50. The Plaintiff is a person with a "disability" as defined by the FHA as a physical or mental impairment that substantially limits one or more of such person's major life activities. 42 U.S. §3602 (h)(1).

51. Therefore, the Plaintiff is entitled to accessible housing and equal enjoyment on an equal basis with individuals without disabilities, as provided by the Fair Housing Act, as amended in 1988.

52. McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC are aware of the conditions and special needs of Mr. Gabriel Cortes, and his needs were and are genuine.

53. McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC are entities with obligations under the Fair Housing Act, as amended in 1988, 42 U.S.C. §§3601 et seq. The Defendant has acknowledged having obligations under these laws, including the Fair Housing Act.

54. Mr. Gabriel Cortes has been a victim not of an isolated incident but of a policy, practice, or pattern of discrimination against individuals with disabilities at the Property. As an example, McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC:

55. Mr. Gabriel Cortes is entitled to equal treatment and equal access to housing as required by the Fair Housing Act (since 1988), which has mandated the provision of reasonable modifications to housing for individuals with disabilities.

56. McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC, systematically through the administration of the Property, substantially fails to meet the technical requirements for the design, construction, and alteration of housing under its jurisdiction. This results in housing not being equally available to individuals with disabilities.

McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC have substantially failed in its obligation to provide access to housing. Also, McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC have failed to timely provide the reasonable accommodations requested by Mr. Gabriel on more than one occasion, causing him mental and/or emotional distress.

57.     The FHA also prohibits discrimination in the sale or rental of housing, including: discrimination in the sale or rental, or otherwise making unavailable or denying a dwelling to any buyer or renter because of a handicap (42 U.S. §3604 (f) (1)); Discrimination against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap (42 U.S. §3604 (f) (2)) and a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling (42 U.S. §3604 (f) (B)).

58.     The level of non-compliance by McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC is so substantial, extensive, and systematic that individuals with disabilities are at imminent risk of harm due to the conditions in public housing. It was precisely the intentional and systematic disregard by the defendant of its statutory obligations regarding accessible housing that caused harm to the plaintiff's body and health, such as depression, anxiety, panic attacks, mental distress, and

other physical, emotional, and psychological effects directly related to the issues that have arisen in his housing. The intentional disregard of the defendant for its statutory obligations is confirmed by the following:

58.1.   Failing to construct and alter housing in compliance with technical standards.

58.2.   Failing to maintain housing to ensure substantial and safe access.

58.3.   Failing to develop and implement a process for identifying housing in need of urgent maintenance or alteration.

58.4.   Failing to establish internal mechanisms and procedures for the development of housing in compliance with federal mandates.

58.5.   Failing to promptly take corrective action upon becoming aware of housing issues.

58.6.   Failing to address existing housing units that have been constructed in a manner inconsistent with applicable regulations.

58.7.   The defendants have failed to timely provide and approve reasonable accommodations without delay. They have played with Mr. Gabriel Cortes' time and health, providing him with housing that did not meet his needs as a person with a physical disability. The defendant failed at the moment when they misplaced the requests for reasonable accommodation submitted by Mr. Gabriel, as well as the letters from his doctors verifying his disability and requesting reasonable accommodation.

58.8.   The defendants failed at the very moment when they chose not to

listen to Mr. Gabriel's requests when he indicated the need for a ground floor apartment, and despite that, they opted to provide him with a fourth-floor apartment.

59. It is believed that McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC have invested money in other non-federal mandate-related matters, including discretionary activities, at the expense of depriving individuals with disabilities of their rights under applicable federal laws.

60. The Plaintiff is aware of the issues with the Property for himself and individuals with disabilities.

61. The actions of McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC have been inadequate; they have chosen not to fulfill their obligations and have used funds for non-essential discretionary matters unrelated to compliance with federal laws. It is also believed that McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC, in a calculated manner, has chosen not to fulfill its obligations for financial reasons, namely, to maximize its profits or retain money for other matters.

62. It is believed that McCormack Baron Management Puerto Rico LLC and Puerta de Tierra, LLC have decided that it is more cost-effective to pay individuals who suffer bodily and health damages and file claims than to invest in compliance with the mandate. It is because of this intentional discrimination by McCormack Baron Management Puerto Rico LLC and

Puerta de Tierra, LLC that Mr. Gabriel Cortes has experienced difficulties, discomfort, anxieties, and a sense of danger. It is due to this intentional and systematic discrimination that compensatory damages are sought under the Fair Housing Act.

## SECOND CAUSE OF ACTION

63. According to Article 1536 of the Puerto Rico Civil Code, the person who, through fault or negligence, causes damage to another is obliged to repair it.

64. According to Article 1536 of the Puerto Rico Civil Code, the defendants are obligated to repair Mr. Gabriel because, due to their negligent behavior, they have caused him emotional distress and physical discomfort. For instance, when the elevator has not functioned due to a lack of maintenance, he has had to endure health issues while climbing or descending the stairs. Additionally, when there were water leaks or seepage in the hallway floor near his apartment or in his apartment, the defendants failed to promptly address the situation. As a result, he had to sleep outside of his room for several days. Furthermore, when Mr. Gabriel requested reasonable accommodations, the solution provided was options outside the housing complex. These are just examples of the numerous hardships that the defendants caused Mr. Gabriel, as detailed in the facts presented.

## JURY TRIAL DEMANDED

**65.**    Plaintiff request jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following remedies:

**A.** Compensatory, punitive, nominal, and consequential damages award not less than $1.000.000.00.

**B.** To provide Mr. Gabriel Cortes with the requested reasonable accommodation, consisting of a first-floor apartment for people with disabilities, with two bedrooms, near a disabled parking area.

**C.** Award of costs and reasonable attorney fees.

**D.** Any other relief that this Honorable Court deems just and appropriate.

**DATED**: July 14, 2023

**VELEZ LAW GROUP LLC**
Civil Rights Division

s/José Carlos Vélez Colón
José Carlos Vélez Colón
USDC-PR 231014

1969 S. Alafaya Trail #379
Orlando, FL 32828-8732

E:  vlg@velezlawgroup.com
T:  (787)-422-1881
     (787)-422-1958

**PLAINTIFF'S ATTORNEY**